The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and His Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, Farm Labor Organizing Committee v. Stein. Ms. Gronke. Good morning. May it please the Court, my name is Christy Gronke and I represent the plaintiffs, Farm Labor Organizing Committee, also known as FLOC, and Valentin Alvarado Hernandez, who are the appellants and cross-athletes in this matter. Section 20.5 of North Carolina's 2017 Farm Act profoundly undermines the ability of farm workers to exercise their constitutional and state statutory rights to associate with FLOC, the state's only farm worker union. Section 20.5 imposes unique and highly burdensome restrictions on FLOC. Can you talk just a tad louder, just a little bit louder? I'm sorry. No, no, it's me, I think. Section 20.5 profoundly undermines the ability of farm workers to exercise their constitutional and state statutory rights to associate with FLOC, the state's only farm worker union. Section 20.5 imposes unique and highly burdensome restrictions on FLOC and its members' ability to enter into purely optional dues checkoff and settlement agreements. It is designed to gut FLOC's ability to function effectively and thus to suppress its vigorous and often controversial speech and assembly. Section 20.5 violates the First Amendment because it narrowly targets FLOC by outlawing entirely voluntary dues checkoff agreements that are available to all other private sector unions and employees in the state. The leading case here is Minneapolis Star, in which the Supreme Court struck down a tax on paper and ink use that had adversely impacted a small group of newspapers, where the state had failed to demonstrate a special characteristic of the newspapers that were targeted that justified the limited scope of regulation. The Supreme Court recognized that such selectively imposed burdens by their very structure suggests that the government is targeting certain disfavored speakers for burdens, and these burdens can suppress speech. As the court observed in Minneapolis Star, a law that targets a small group of speakers for discriminatory treatment, quote, suggests that the goal of the regulation is not unrelated to suppression of expression, and that such a goal is presumptively unconstitutional, unquote. The severe restrictions imposed by Section 20.5 are extremely targeted. FLOC has been the only farm worker union engaged in collective bargaining in the state for decades, and it is the only union whose activities are impacted by Section 20.5. Why isn't it more reasonable to conclude that that's a consequence not of North Carolina law, but of the National Labor Relations Act, right? I mean, North Carolina's position is, look, if we could ban this for all unions, we would, but we only can for this category of unions because the NLRA exempts those unions. So why, I mean, I agree, it seems pretty micro-targeted, but what do you say to the proposition that the reason it's micro-targeted is because federal law wouldn't allow it to be anything other? Well, Your Honor, as we pointed out in the briefs, there are other categories of unions that are not targeted by this law that are exempted from NLRA coverage. So I don't think that really answers the question. And simply because there is a regulatory gap doesn't mean that the state should fill it in a burdensome and targeted manner. Can I ask you another question on the dues checkoff provision? So the briefing is a little bit of ships passing in the night because of the disagreement in part about what the provision means. So I understand that you argue that it means the broader thing, but let's assume for the sake of argument that it means the narrower thing, that the district court thought that it meant. And then I see these two cases of ours that say there's no First Amendment right to a dues checkoff provision. And your argument, as I understand it at that point, is that's public versus private. Do you have any other way to distinguish? Again, assuming that the narrower construction of the provision is correct, which I know you don't agree with, but assuming that it is, do you have any other way of distinguishing those cases other than the public-private distinction? You're speaking of the Campbell case, I think, Your Honor. Yes. So looking at the Campbell case, something that I think is critical other than the public-private distinction, which I do think is critical, the question there was what the state was doing as an employer in its role as an employer. Here, the state is not acting in its role as an employer. I understand that Campbell could and there's language in it, but there's also just broad language in Campbell that says there is no First Amendment right to have your employer withhold your union dues.  What do I do with those? Well, Your Honor, obviously there is Campbell. There is certainly a line of cases that say that there's no constitutional right to dues checkoffs. But this is a case about targeting and narrowly targeting one union and one small category of unions, but really one union for nearly insurmountable obstacles to fundraising. What is it about that you say there are nearly insurmountable burdens on fundraising? But isn't that true? I mean, is it any more true in this case than it is in most dues checkoffs? Or is that sort of a... It is more true in this case, Your Honor. Help me understand why you think that. Certainly. First of all, it's in the record that dues constitute 50 to 60 percent of FLOC's budget. And we've talked about who are the members of FLOC. They are H-2A guest workers from Mexico. They come here a few months out of the year. They're living dispersed in rural areas in the state. They're living in employer-furnished housing for the most part. They're not having access. They don't have their own transportation. They are mostly monolingual Spanish speakers. There are many burdens to accessing the means that would allow them to pay dues in other ways. Okay. Because it's uniquely hard for them to pay their own dues is the argument. Yes. It's certainly part of the argument. Yes, Your Honor. But I would point out that in Minneapolis STAR, there is not a requirement that the burden be particularly severe. What matters is the targeting and the threat that the targeting conveys. Can I ask you then? I know I asked you to ignore the public-private distinction. Could you, again, assuming the narrower reading of the dues checkoff provision, why does the public-private distinction matter? The public-private distinction matters because of ESRSA, Your Honor, and the Supreme Court's reasoning in those cases that have to do with the state interest in not having to subsidize speech. In other words, the state has more freedom to discriminate against speakers when it is subsidizing the speech. Here we're not talking about state-subsidized speech. Wait, I'm sorry. The theory is that the state has more authority to discriminate against speakers than private individuals do? When they are subsidizing the speech, yes, Your Honor. That's clear from ESRSA. But a private, there's no First Amendment problem with a private entity subsidizing or making any choices about speech, right? Like the whole point of the First Amendment doesn't really limit the private actor. That is true, Your Honor, and before Section 20.5, agricultural producers, employers were free to agree to these checkoff agreements or not. I wanted to, going back to the importance of ESRSA, I would also point out that in Justice Ginsburg's concurrence in ESRSA, she specifically notes that all parties to that case agreed that if the impositions that were at stake in ESRSA were in fact being imposed on private parties, they would violate the Constitution. And I think that's telling. Because again, Campbell, we are discussing the state in its role as subsidizing speech and also as an employer. I do want to go back to a point that Judge Hyten brought up earlier with regard to targeting and the question of the regulatory gap. There is some interesting legislative history here in the form of SB 375, which was earlier legislation that was considered by the General Assembly, which would have outlawed not only dues checkoffs for all unions that aren't covered by the National Labor Relations Act, but also some private organizations, dues for private organizations being deducted from people's paychecks. And indeed, the court, excuse me, the legislature was unable to pass that law. And then in a much more targeted form. I just don't want to run out of time. I want to talk just for a minute about the settlement provision. Oh, yes. And there seems to be sort of an assumption here that if we adopted your broader reading, that is that this bars sort of all settlement agreements, not just the subset that is suggested by your colleague, that that would be a First Amendment problem. And I'm having a little trouble understanding why, even under the broader reading, there's a First Amendment concern. So, assuming that the statute were being interpreted to apply to all settlement agreements between an agricultural producer and flock?  Okay. That is a concern, Your Honor, because of the very clear precedent that's actually been recently acknowledged by this court in capital industries, which is that as an expressive association, flock has a right to use litigation in service of its expressive goals, and its members have a right to join together to increase. Totally fair. And so if what the provision was doing was barring you or inhibiting you from going to court, right, which is the line of cases, button and premise and all those. So if it's inhibiting you getting a lawyer or filing suit or doing all those things, that seems totally correct, right? The problem is this provision is doing the opposite, right? It's forcing you into court. It's the opposite. Instead of putting a barrier to your using litigation or availing yourselves of the court, it instead is saying, effectively, you can use the court. You are free to use the court. In fact, because we have some concern about the misuse or abuse of these types of suits, you can only use the court because we want to ensure that the relief that you're getting from these suits is limited to relief that you're lawfully entitled to. And so we want judges deciding rather than using what they claim, and I'm not accepting it, but they claim a sort of strong-arm tactics to force, you know, CBA agreements, right? And so I'm having trouble understanding how that's inhibiting you getting into court. It's forcing you into court, right? It's forcing you to litigate your case to absolute conclusion, to final judgment. Right, and so what case do I look at? Because none of the other cases you cite are that direction. They're inhibitions to you getting to court, right? This is a forcing you to court. Why would we think that's a First Amendment problem? It might have all kinds of problems, but why is that a First Amendment problem? It's not an access to the court case at all. Well, Your Honor, I think that you're right that this is a very unique law, and so we don't necessarily have parallels in the case law. However, the case law discussing the importance of settlement, which is cited in our brief, I think we all recognize that settlement is critical to the ability to litigate, the ability—now it doesn't mean you can ever— That's a great policy argument, right? Maybe that's a good thing. Like, you know, talk to your legislature, right? But, like, what I don't see is that, like, settlement as being a First Amendment value, right? It is really important. Like, I like settlements too, right? Judges love for cases to go away. But, like, the First Amendment doesn't make me like it. It's just my, like, general policy preference. I understand that, Your Honor. I think that one of the core principles of First Amendment access to the courts would have to be maybe not unlimited but meaningful access to the courts. And I think that that has to mean— You have full access to the courts. What you don't have access to is getting away from the courts. Well, Your Honor, I would point again to the extreme targeting here and the extreme burdens that this puts on one organization. And because of the First Amendment interest in conducting litigation, particularly when you are an expressive association, that I would say that there has to be a compelling interest to restrict settlements that are available to every other union and every other private sector worker. And, you know, I think, you know, there is a real concern because of the prohibitive costs of litigation that if cases can't be settled or there's no reasonable opportunity to settle, that cases can't be brought at all. That's just a very basic component of meaningful access to the courts in the legal system. But I guess I go back to the sort of question. You agree that no court has ever said that or required that as a First Amendment value. We'd be sort of creating a new First Amendment right to say that. I wouldn't say it's a new First Amendment right, but I will acknowledge that I'm not aware of precedent on this point that says that settlement is a First Amendment right. I see my time has run out. I look forward to speaking with you more on rebuttal. Good morning, Your Honors. May it please the Court. My name is Matthew Tolchin. I'm an attorney with the North Carolina Department of Justice, and I represent the Attorney General in this case. Your Honors, this case involves a facial challenge to Section 20.5 of the 2017 Farm Act, which was passed to strengthen North Carolina's right-to-work policy. As this Court knows, facial challenges are disfavored, and there is a strong presumption that the law is constitutional. And as my colleague, my counsel Plains pointed out, there's two provisions of this case, the checkoff provision and the settlement provision. And the plaintiff must show that under no set of circumstances would either provision be valid, and plaintiffs can't do so in this case. And one of the reasons for that is this is an economic regulation of contracts, and it was enacted to protect the farmers and the agricultural industry. And the agricultural industry is the largest and most important industry in North Carolina. So, counsel, one of the things that your colleague on the other side did not talk about and we haven't talked about yet is what these provisions say. And to me, that might be a good starting point. Yes, Your Honor. Briefly. I'll start with the settlement provision first, Your Honor. And our contention is that the district court erred in striking down that provision for three main reasons. The first, as Your Honor pointed out, the plain language of the statute makes clear that it applies to only certain settlement conditions, not even settlement agreements, but provisions of settlement agreements. The second reason is defendants' interpretation of the statute is reasonable and would save it from unconstitutionality. Well, let me ask you that because Judge Richardson asked you, do you agree it would be unconstitutional if it was interpreted the way the plaintiffs say it should be? Your Honor, I think there are several situations where, yes, it would be. And the reason for that is if you look at Wait, it would be okay or it would not be okay? It would be, sorry, constitutional, Your Honor. And the reason for that is because the right at issue, collective bargaining, is not a constitutional right. And that's established by the U.S. Supreme Court and many other courts. And that's the fundamental right at issue. Do you also agree that the First Amendment doesn't include a right to settle? Yes, Your Honor. And I think in terms of if you look at a settlement, a settlement, what is a settlement? It's a contract. And so this is a type of regulation of contracts. And there are many examples of where a legislator have restricted certain types of settlements, excuse me, medical malpractice being one. But, Your Honor, to your point, the behavior at issue or the coercive actions at issue that the legislator tried to address don't involve lawsuits involving unions. They're not brought by FLOC or other unions. These are lawsuits brought by individual plaintiffs, not challenging CBAs. It's usually involving violations of Fair Labor Standards Act. And yet these individual plaintiffs who are represented by FLOC's general counsel, as terms of settling their lawsuit, are trying to coerce farmers into a settlement that recognizes FLOC and non-parties. I understand the policy. But can you address, Judge Mott, what I think Judge Mott's question was and help me understand? I mean, this is not a model of clarity statute, I think, we might agree on. And can you help me understand why we should interpret this, assuming we have to interpret it at all, but why we would interpret the conditions upon language to require two agreements, right? I mean, I take the argument to be that if you're conditioning a provision that is conditioned upon something else, that something else must be external. But I'm not, frankly, sure I totally follow the argument. Can you help me? Your Honor, the best place to start is let's start with the statute. And so the district court and the plaintiffs asked this court to interpret the statute as broadly prohibiting all settlement agreements between agriculture producers and unions. State's position is that it does not do that. And what is the state's position about what it does do? And the reason that reading is, in our position, overbroad and incorrect is it ignores the very first line of the statute, which you read, it says, any provision that directly or indirectly conditions. And so if you take this settlement provision as meaning it applies to all agreements, then it renders that condition of being either a union employer or non-union employer absolutely superfluous. And not only that, that interpretation also ignores the amended language, the language that was amended in the statute, which focuses on the provisions of the agreements. And if you look at the language that was amended and added, it specifically says the terms of an agreement. So by reading it broadly, you are rendering that total amended language and also the purpose of the statute as being meaningless. And again, this is a facial challenge. And so you need to presume that the legislation is constitutional. And if you look at the context and the legislative history behind the amendment of the statute, it supports a narrower reading because, again, this would be helpful. So I think I know your answer to this, but I want to make sure. So give me an example of what you think a quintessential type of thing this statute forbids. The scenario is, but for this statute, the following would be legal. Because of this statute, that thing is now illegal. What is that thing? So the thing is that illegal is exactly what the statute is intended to prevent. It's the coercive lawsuits that are brought against by individual plaintiffs. It's the use of litigation as coercing farmers into entry. Now, that's a description of your normative force. Literally, there's a lawsuit between X and Y. There's an agreement that says Z, and that's now illegal. Just describe that to me. The Z that's illegal is in order to settle this lawsuit, you must recognize, flock. So an individual agricultural worker sues their employer. And that's X and Y, the employee and their employer. And X and Y settle. And as a condition of X and Y's settlement, Y has to recognize Z as a union. Not only recognize Z, enter into a collective bargaining agreement. Enter into a collective bargaining agreement with Z. That's what you think is the quintessential. And so what the law is intended to do is to separate out that function. Separate out this collective bargaining aspect of it from the lawsuits. And the use of coercion or the use of a threat of litigation or impending litigation to force a farmer to enter into a collective bargaining act. And so the General Assembly was aware of these lawsuits and was aware of the problem with these lawsuits. And so it amended the statute to focus just on that aspect. And again, so the focus on that aspect, if you take plaintiffs and the district court's interpretation, by broadly outlawing all settlement agreements, it doesn't focus on that. It doesn't at all. Because flock is a non-party. The union is non-party to that. And also, if you look at the overall structure of the right to work statute in general, if you look at, A, the original right to work statute, which focused on the terms of agreements between unions and employers. And the amendment of the first, when this was amended back in 2013, it, again, focused on provisions of approach agreements. And the issue there was the use of threat of unions into trying to get favorable terms or different terms into purchase agreements. And so that's why it was amended in 2013 to focus on the provisions of the purchase agreements. And it's the same is true in this case. It focuses on the terms of a settlement. It doesn't prevent the union or individual plaintiffs from filing lawsuits. It doesn't prevent the union or plaintiffs from settling lawsuits. It doesn't prevent any of that. So your position would be that there is no possible, you don't even need to go to the First Amendment or any of the constitutional claims, because this is, is that correct? Correct, Your Honor. All right. But if you're looking at the dues provision, you make the same kind of argument, and I'm not sure it works with respect to the dues provision, does it? Well, Your Honor, I think it does if you look at the behavior that the dues checkoff provision and the rights at issue there. The rights, the fundamental right at issue, and this is what the plaintiffs are arguing, is they have a right to dues checkoffs. And that argument is directly contrary to this Court's ruling in Campbell and also U.S. Supreme Court precedent. Their unions do not have a constitutional right to payroll deductions, regardless if they use that money for expressive activity. And as this Court explained in Campbell, the reason for that, First Amendment isn't implicated because prohibiting dues checkoffs, and this is where I quote, does not prohibit, regulate, or restrict the right of unions to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups. And that site, just for the record, is 883 Federal 2nd at 1256. And the reason for that is it's far too attenuate to expressive activity. Preventing dues checkoffs doesn't have any impact on first expressive activities. The laws doesn't prevent or prohibit dues checkoffs at all. It just prevents agreements that require farmers to act as treasurers for a union, and if they fail to do so, to face severe financial privilege. That's all it does. So because of that, it doesn't violate any of these constitutional provisions either. It doesn't affect the First Amendment. According to the state. Correct. Correct. Your Honor, but even if it was, even if the First Amendment is implicated in this case, and in our position obviously it isn't, the provision is still constitutional because it's viewpoint and content neutral, and it's narrowly tailored to support a substantial government interest. I mean, like the statute at issue in Campbell. It's facially neutral. It doesn't target out any subset of message for a disabler. It applies to any agricultural union or producer. What do you say to your colleague's argument that it just so happens that it only targets one? I agree that on its face it's neutral, but what do you say to your colleague's argument that it just so happens to hit only one union? Well, Your Honor, the fact that it is allegedly the only union doesn't prevent the legislator from enacting legislation that impacts the agriculture union. I mean, if you take that to its full conclusion, it would render strict scrutiny to any regulation that affects the agriculture industry. But you don't even, if you take it further. But doesn't it also affect, I mean, when we look at both of these provisions, I mean, the settlement provision is more obvious. I mean, the people that might be most upset by the settlement provision may well be some of the farmers, right, because they, too, are forced into court and have to litigate instead of resolving cases. I mean, they've been voluntarily entering these agreements, which means to me that they would prefer to have settled them, at least the ones that did, in the manner they did rather than go to suit. And now they have to go to suit. So it seems to me that the settlement provision, most plainly, is imposing a burden both on the union and all the farmers who are potentially in litigation with them, right? I mean, that one's not targeting the union alone. It's targeting both sides of those voluntary agreements. Correct, Your Honor. And in this case, but the law, as the district court interpreted it and as it is written, doesn't prevent dues checkoffs at all. It just prevents contracts that require farmers to do it. It's still voluntary. I think the question switched to the settlement agreement, not to the dues checkoff. I think it's the same. I think the same thing plays with the settlement agreement. But I think it's clearer. Right. So, Judge Richard, to your point, and this is the reason why in the checkoff provision, I think it's a little bit more important, is that there is no bar on farmers entering into dues checkoff. All right. So can I ask you this question, which is maybe a little esoteric? But we seem to have two choices here with the checkoff provision. One, we could narrowly interpret the checkoff provision, as you've suggested, right, contrary to your colleagues. And if we did that, then the First Amendment question is easier. We might say easy, but I'll just say easier. But in doing so, we're like intruding on the state to interpret their statute for which there's a dispute about how to interpret it. The other option, right, is to say, even under the broader interpretation, there's still no First Amendment problem. And that seems, you know, it's harder than the first question, but avoids, you know, this court entangling ourself in, you know, North Carolina statutory interpretation. Do you have a sense of, you know, one's sort of like a little bit of constitutional avoidance, one's a little bit of like avoid interpreting state statutes as a federal court? Both seem like sort of values. Do you have a thought about which one we ought to be doing? Well, Your Honor, I think there's two answers to that. One, I think, based on precedent, not only from this court, the U.S. Supreme Court, is from a dues checkoff position, there is no First Amendment issue. But even if there is, I think in terms of constructing. Well, but we would have to resolve the public-private issue. Well, the public-private issue doesn't change the right. I understand that. But what I'm saying is that would be an additional issue we'd have to resolve that we really probably would not have to resolve if it was just permissive. And so this goes to, you know, the issue that we raised in our briefs and we talked about, particularly with regard to the settlement provision where the district court erred. And that's in terms of the principles of constitutional interpretation and constitutional avoidance. And when you're interpreting a statute, which is what courts do on a regular basis, even federal courts have to interpret state law. That's what this case is centered on. It's focusing on a state law. And in order to do so, the district court should look to the state law's constitutional rules of canyons of interpretation. And North Carolina courts have long applied a presumption against construing a statute in a way that would make it unconstitutional. And the district court failed to do that in the settlement provision context here and obviously did so in the checkoff provision, which is proper. And so the defendant's interpretation of the statute is constitutional. So, Your Honor, I see my time is up and I'd like to reserve the remaining time. You would agree that there are a number of ways to write this opinion, right? Okay? Yes, Your Honor. Okay. Do we have some rebuttal? Thank you. To address some of my colleagues' arguments about the dues checkoff provision, we said this in our briefing, but it bears repeating. This is not about whether there is a constitutional right to dues checkoffs. This is about targeting a single union for extreme burdens to fundraising that other unions do not experience, comparably situated unions are not experiencing. And the question is really whether a state can target a single expressive association. Here, Flock in this court has said that unions, like the NAACP, like the ACLU, are archetypal expressive associations. Help me understand the question here. So you say it targets the union. But the checkoff provision, like, bars agreements, which means it targets two different people, right? It targets both the, well, maybe in this case, three, right? Like a union as the beneficiary, but really the two people it's actually targeting, I think, is the employee and the employer, right? And so the effect is maybe felt most by the union because they're getting the money. But the truth is the farmer, too, right, may want to do this to encourage his workers and to have good morale and all the sorts of things he might really want a union, right? Some farmers do. It sort of helps them with management and labor issues. And he's prohibited from doing that, too, right? So it doesn't just bar unions from doing this. It also bars farmers from entering these types of agreements, which presumably they believe to be in their advantage before this law. And so it's not limited to unions, is it? It's unions and farmers, in which case it doesn't look so micro-targeted. Well, I think it does, Your Honor, because, again, even if you ‑‑ and I agree with you. This imposes burdens on some growers as well in the sense that there may be some agriculture producers who want to, as you say, have an agreement with the union. And this prevents them from entering. But, again, I would look at this prevents them from entering contracts that would be enterable if they were not agriculture producers. And so you still have that targeting. Right. So it's targeting them, right? I mean, I get that. And the question I've got is, like, then it doesn't look like Minneapolis Star and these other cases, right? Because it's actually not ‑‑ it's targeting both sides of an issue, right? So it's targeting both employers and unions, right? And so in that sense, it's not like Minneapolis Star, which is focused on a single ‑‑ I think it was a newspaper. I can't remember. But whatever. The single expressive organization there, it didn't have a flip side, did it? Well, Your Honor, I think it did. One could argue, for example, that ‑‑ let me actually get outside of Minneapolis Star. I'm thinking about the Time Warner case, the Fifth Circuit case that's cited in our briefs. There, there were agreements that were being targeted for burdensome regulation. And I believe they were cable franchise agreements. You can see that that would burden not only the cable company, but organizations or municipalities that might want to enter into these agreements with the cable company. They're all running a cable. I mean, the cable franchise agreements, they're all in that same ‑‑ they're on the same side of that issue, right? And so that looks more micro‑targeted than when you've got here, you've got them on both sides of the issue. Well, maybe, and I don't want to sort of quibble too much with your technology. Quibble. You're here to quibble. I'm okay with that. Please quibble. With respect, Your Honor, I think that saying that they're both opposing sides of the issue, there may be some employers who are pro‑union, as you said, and they both want to enter into these contracts, which would be a binding agreement, a commitment between employer and employee to have certain rights extend to the workers. And it's taking that away from them. It has the most adverse effect on unions, and I think we've documented that on FLOC. But that it is that micro‑targeting is still happening with respect to people who want to enter into these kinds of agreements. Help me just understand, why is that micro‑targeting? If it has the most effect on one group, but it has an effect on another group, then we've got to consider the total effect, right? I mean, then it's not like Minneapolis Star. And I get, maybe there's a Fifth Circuit case, but when I look at the Supreme Court cases, they don't seem to look like that. Well, I think Arkansas Writers Project is another example of a situation where maybe both sides are being impacted by the taxation. Because it's a sales tax, so on a subset of magazines. And so you can see there that the purchaser would be impacted adversely, but also the creator of those magazines, the publisher of the magazines. And I would just point out, with regard to interpreting this provision, the dues checkoff provision, as discretionary, and that this is going to save the statute, even if the dues checkoff provision were interpreted to allow discretionary agreements, it's still incredibly burdensome. We all know contracts are important in American life. And the ability to not secure these contracts is very problematic. Those binding, consistent agreements that our economy runs on. Further, if there's no right to these binding contracts, or no option for these binding contracts, I should say, there is the specter of being prosecuted for conspiring to entering into binding contracts. And there's a real threat here of criminal and civil liability, where unions may be trying to enter into discretionary agreements that are allowed by the law, but may run afoul of somebody's overzealous accusations that they're trying to enter into binding contracts. So there's a real chilling effect here. Turning to the arguments that were made about the settlement provision, obviously we believe that the district court's interpretation was correct. And as Judge Richardson noted, federal courts are not free to impose narrowing interpretations on state statutes unless those interpretations are readily apparent. And this is not a model of clarity. It is not readily apparent that rewriting the statute in the way that defendant wishes would work to save it here. If you had to make the order of decision, that isn't a fair question for you. Never mind. And also, problematically, this narrowed interpretation is not binding on state courts. You know there are 100 counties in North Carolina, so we have a real problem of the threat here. But even if that narrowed interpretation were correct, the settlement provision is still unconstitutional for the reasons we outlined in our brief, that flock members have a well-established First Amendment right to join together to pursue litigation in support of shared goals, whether as a form of public advocacy or simply a practical means of gaining meaningful access to the legal system. So you make a bunch of constitutional arguments. Yes. And you regard the First Amendment as your strongest constitutional basis? I would say so, Your Honor. We do think our equal protection argument is strong as well. And we haven't had an opportunity to- We all love all our children, but I asked you if you spent all the time on the First Amendment. I think we see this primarily as a First Amendment targeting case, if you will, Your Honor. And to conclude, I see my time has expired. We would respectfully ask the court to reverse the district court's decision upholding the dues checkoff provision, to affirm the district court's injunction against the settlement provision, and to direct entry of judgment for plaintiffs on their First Amendment and equal protection claims. Thank you. Thank you, Your Honor. I'll try to, since I didn't do so well the first time in clearing up these issues, I'll try again. I'm sorry. I did have one question for you on the equal protection argument that I want to make sure I don't forget. So when I look at, this is page 3011 of the joint appendix, I see the district court saying that after reviewing the record, it, quote, remained equally plausible, or perhaps even more plausible, that anti-union views rather than bias against Latinx noncitizens motivated this enactment. If this were a bench trial, that seems totally unproblematic to me. How is that consistent with Rule 56, to then grant summary judgment after saying it is equally plausible, it means X or it means Y? I think we wouldn't agree that of the district court. No, I know, but you'd agree that under Rule 56, if a district court thinks two things are equally plausible, you should not be granting summary judgment. Because I think that that's not the deciding issue in terms of, from deciding the legal issue, Your Honor. And I think that's, it goes to, there's a couple different analysis that the district court then goes to and then determines the scope and the reasons behind the statute, the enacting of the statute. So, for example, Your Honor, you know, there are many reasons, non-discriminatory reasons, valid non-discriminatory reasons why the General Assembly enacted the statute. Your Honor, again, as a facial challenge, that the presumption of the law is constitutional. And as this court admonished in Raymond, and also as precedent stands, the motives of individual legislators can't be imputed to the whole General Assembly. I accept, Your Honor. Thank you. I distracted you from where you wanted to go, but I wanted to ask that before you got into it. No, thank you, Your Honor. But I think the big picture here is really standard of review. And the First Amendment has many different standards of review. And so our position is that there is no First Amendment right. But even if the First Amendment right was implicated, it doesn't rise to, it doesn't require the strict or heightened scrutiny that plaintiffs are advocating. And a couple reasons for that is, one is the statutes don't prohibit all conduct in general, overall conduct. Farmers are still allowed to use checkoffs within their description of their employees, and a lot of employers will do so and do do so. And farmers are entitled to enter into collective bargaining agreements. That's not prohibited. And I would point out, Your Honor, that the General Assembly could, without violating the First Amendment or any law, prohibit all dues checkoffs, unions from doing it completely. And it tried to do so in previous versions of the statute, but it didn't have the votes. And so if you look about the targeting treatment claim, the statute is facially neutral, Your Honor. And that's in terms of Campbell. Campbell made the same arguments. The union in Campbell made the same arguments. They said that we were targeted as retaliation for our political beliefs. And so this court cautioned that you can't look behind the motives of the legislator in a facially neutral statute, which this is. And I also would say that in cases subsequent to Minnesota Star, they have said that there's different treatment of classes within classes can be justified by special characteristics. And so the record clearly shows why the agriculture industry, and specifically, is different and is treated differently. The state has a longstanding history of protecting the agriculture industry. Can I ask one quick question before your time runs out? If you assume just for a minute that we adopted the broad reading of the settlement provision, so in other words, it bars all settlements, or we chose not to answer that question because it didn't matter for the Constitutional, the First Amendment question, what would the rational basis be for barring all settlements? I get the rational basis for barring the type of quote-unquote coercive settlements that we've talked about, but what would the rational basis be for barring all settlements? I think there's a couple of reasons. One, I think if you look at the collective bargaining aspect of it, in terms of the right-to-work policy, it's just a strong way of doing that. Or it's also a way of forcing unions and farmers to collectively bargain, rather using the courts to achieve that goal. And that's a legitimate view of a legislator of deciding what the courts should be used for. And so that's one of the reasons that it would do so. I'm sorry, I didn't understand that. It's better to force people into court than to have them agree? Sorry. Rather than force parties into court to enter into collective bargaining, you separate the litigation aspect of it out so that you do collective bargaining, just as any employer and union will do, rather than using a lawsuit as a basis of that. And so that's what the language targets. It's as a condition to settle a lawsuit. And so if you broadly prohibit settlement agreements between unions and employers, you are taking the litigation aspect out of it. It doesn't outlaw collective bargaining, which it could without violating the Constitution. And so that would be a broad reading of it, Your Honor. And I would just write that we're not advocating a rewrite of the statute. Our position is that the district court wrongly interpreted the settlement provision and that as written under its plain terms, it does what the defendant says it does. But the court didn't even need to determine whether the defendant's interpretation of the statute was correct. It only needed to determine whether it was plausible because this is a facial challenge. And defendant's interpretation is plainly plausible because it would save it from its unconstitutionality. I see that my time is up, Your Honor. We would just ask that the court reverse the district court's decision granting summary judgment to the plaintiffs and affirm its decision to grant summary judgment to the defendant. Thank you, Your Honor. Thank you both for your arguments. As you know, we usually come down and greet you, but conditions prevent it now. But we appreciate your arguments, and we look forward to seeing you the next time.
judges: Diana Gribbon Motz, Julius N. Richardson, Toby J. Heytens